CARRIE ROSSI, PROSECUTOR, v. THE PENNSYLVANIA RAILROAD COMPANY, RESPONDENT.

Submitted October 12, 1934—Decided March 27, 1935.

Before Justices HEHER and PERSKIE.

For the prosecutor, *Isidor Kalisch*.

For the respondent, *John A. Hartpence* and *James R. Laird, Jr.*

The opinion of the court was delivered by

HEHER, J.  This is a proceeding under the Workmen's Compensation act.  *Pamph. L.* 1911, *p.* 134.  The decisive question is whether prosecutor's decedent, Anthony Rossi, who suffered fatal injuries by accident arising out of and in the course of his employment with the respondent railroad, was, at the time, engaged in commerce intrastate in character. The compensation bureau and the Hudson Common Pleas, on appeal, held that the deceased was then engaged in interstate commerce, and for that reason compensation under the state statute was denied.

These are the essential facts:  Respondent, in the conduct of its interstate commerce, maintains, at a point east of the city of Newark, a transfer station designated "Manhattan Transfer."  All of its passenger trains bound for the city of New York from the south and west stop at this station.  The locomotive is there supplanted by an electric engine, and the train is then taken to its New York up-town station through the Hudson river tunnel.  The same course is followed with respect to interstate trains bound from New York to the west and south through the State of New Jersey.  The train is taken from the New York station to the transfer by an electric engine, at which point the electric engine is replaced by a locomotive used exclusively for interstate transportation. Some three miles from the transfer, respondent maintains a locomotive servicing station called "Meadow Yards."  The steam locomotives, used to haul interstate trains to the transfer, are immediately taken to this service station for refueling and such repairs as may be necessary;  and the locomotives needed to haul southbound and westbound trains from the transfer in interstate commerce are supplied from this station.  There was a prescribed routine in the handling of such locomotives.  After the detachment of the steam locomotive from the train hauled into the transfer, it was taken to the service station, and prepared for its scheduled outgoing interstate run.  It was first taken to the inspection pit and there examined for the discovery of needed repairs.  It was then moved to the ashpit for the removal of ashes, and from

this point to a coal wharf, running parallel with the inspection pit, for the supply of coal required to generate steam motive power for its outgoing trip. From this point it was moved to a washing stand, and from there to the repair shop, if repairs were needed. If repairs were not required, the position of the locomotive was reversed on a turntable, and it was placed in a nearby storage yard to await departure for the transfer. The deceased was employed at the coal wharf. It was there that the fatal accident occurred. The wharf was an elevated structure. This was the coaling process: The car containing the coal was placed on the wharf, and the locomotive beneath it on a track which paralleled the wharf. The coal was dropped, by force of gravity, through a chute extending from the open hopper pockets of the car to the locomotive tender below. The chute tapered to a narrow outlet at the lower end; and the flow of the coal was controlled by a gate and movable steel apron placed at this point. The chute was approximately ten feet long and between three and four feet wide. It was decedent's duty to take the measures necessary to effect a movement of the coal from the car, through the hopper pockets, into the chute leading to the tender of the waiting locomotive. His assistant, in this instance, one Yawylak, was in charge of the operation of the gate and apron at the lower end. When the customary supply of coal was placed in the tender of the locomotive, the gate was closed, and the apron raised, until another locomotive was moved up for coaling. When the flow was thus cut off, the coal in the chute of necessity remained there. The capacity of the chute was approximately four thousand pounds. It was decedent's duty to maintain a movement of the coal from the car into the chute; and on occasions he was required, when the flow was for any reason impeded, to ascend to the top of the car and free the clogged fuel with the aid of a long iron poker.

These were the circumstances attending the fatal accident: On the afternoon of April 22d, 1932, a steam locomotive that had just hauled an interstate train to the transfer was brought to the yards to be refueled and serviced preparatory to a

scheduled run from the transfer at five-thirty-two P. M., of a New York train bound for Washington, District of Columbia. When it reached the coal wharf, Rossi, who had reported for duty at three P. M., was engaged in the performance of his usual duties on the platform, while Yawylak was in charge of the lower end of the chute. They had refueled ten or twelve locomotives engaged in interstate commerce during the afternoon. When the tender of this locomotive was half-filled with coal, the flow through the chute ceased, although the gate was open. Investigation by Yawylak disclosed Rossi prostrate upon the upper platform, suffering from the injuries which resulted in his death the next day. The latter said he had fallen from the top of the car from which coal was being conveyed through the chute into the tender of the locomotive below. In these circumstances, it is an inescapable inference that, at the time of his fatal fall, the deceased was engaged in an effort to dislodge clogged coal in the car so as to start anew the flow into the chute. The performance of this duty required him to ascend to the top of the car.

The burden is upon prosecutor to establish the claimed right to compensation under the state statute, *i. e.*, to show affirmatively that the deceased was engaged in a service not regulated by the Federal Employers' Liability act (45 *U. S. C. A.*, § 51-59) ; and there is no presumption of this fundamental fact. *Lincks* v. *Erie Railroad Co.*, 91 *N. J. L.* 166; *Carberry* v. *Delaware, Lackawanna and Western Railroad Co.*, 93 *Id.* 414. And the test of employment in interstate commerce, within the intendment of the federal statute, is this: Was the employe, at the time of the injury, engaged in interstate *transportation* or in work so closely related to it as to be practically a part of it. The federal act does not speak of interstate commerce in a technical legal sense. *Chicago and Northwestern Railroad Co.* v. *Bolle,* 284 *U. S.* 74; 76 *L. Ed.* 173; *Shanks* v. *Delaware, Lackawanna and Western Railroad Co.,* 239 *U. S.* 556; 36 *S. Ct.* 188; 60 *L. Ed.* 436 ; *New York, New Haven and Hartford Railroad Co.* v. *Bezue,* 284 *U. S.* 415; 76 *L. Ed.* 370; *Chicago and E. I. Railroad Co.* v. *Industrial Commission,* 284 *U. S.* 296; 52 *S. Ct.* 151;

76 *L. Ed.* 304; *Chicago, B. and Q. Railroad Co.* v. *Harrington,* 241 *U. S.* 177; 36 *S. Ct.* 517; 60 *L. Ed.* 941; *Illinois Central Railroad Co.* v. *Cousins,* 241 *U. S.* 641; 36 *S. Ct.* 446; 60 *L. Ed.* 1216; *New York Central Railroad Co.* v. *White,* 243 *U. S.* 188; 37 *S. Ct.* 247; 61 *L. Ed.* 667; *Southern Pacific Co.* v. *Industrial Accident Commission,* 251 *U. S.* 259; 40 *S. Ct.* 130; 64 *L. Ed.* 258; *Industrial Accident Commission* v. *Davis,* 259 *U. S.* 182; 42 *S. Ct.* 489; 66 *L. Ed.* 888; *Minneapolis and St. Louis Railroad Co.* v. *Winters,* 242 *U. S.* 353; 37 *S. Ct.* 170; 61 *L. Ed.* 358; *New York Central Railroad Co.* v. *Marcone,* 281 *U. S.* 345; 50 *S. Ct.* 294; 74 *L. Ed.* 892. The words "transportation" and "commerce" are not interchangeable; they convey different meanings. "Commerce" covers the whole field of which transportation is only a part; and the word of narrower signification was chosen understandingly and deliberately as the appropriate term. The business of a railroad is not to carry on commerce generally. It is engaged in the transportation of persons and things in commerce; and hence the test of whether an employe at the time of his injury was engaged in interstate commerce, within the meaning of the federal act, naturally must be whether he was engaged in interstate transportation or in work so closely related thereto as to be practically a part of it. *Chicago and Northwestern Railroad Co.* v. *Bolle, supra.*

So tested, the service at which Rossi was engaged, at the time the fatal accident befell him, falls into the category of work so closely identified with interstate commerce as to be, to all intents and purposes, a part of it. He and his co-laborer were directly engaged in fueling a locomotive then employed in interstate transportation. It concededly had not been withdrawn, temporarily or otherwise, from such service. Such provision of fuel for the generation of motive power was indispensable to the continued operation of the railroad's interstate transportation business; and the servicing of the locomotive in question did not constitute an interruption, in any sense of the term, of the interstate service in which the locomotive was employed—its character as an

instrumentality of such commerce remained unchanged. Compare *Minneapolis and St. Louis Railroad Co.* v. *Winters, supra; New York, New Haven and Hartford Railroad Co.* v. *Bezue, supra; Industrial Accident Commission* v. *Davis, supra.* There is here no confusion of the terms "interstate commerce" and "interstate transportation." The work being done at the time deceased sustained his injuries was not so remotely connected with interstate transportation, in its narrower signification, as to admit of classification as interstate commerce in the broader sense only. True, the deceased was not, at the time, engaged in interstate transportation in its restricted sense, but the work was clearly so related to such transportation as to be, in every fair sense of the term, a part of it. It meets the test of direct and immediate relation to interstate commerce in that sense.

The cases relied upon by prosecutor are not analogous; the acts in question were more or less remote from, and only indirectly connected with, interstate transportation. In *Shanks* v. *Delaware, Lackawanna and Western Railroad Co., supra,* the injured servant was employed in a machine shop maintained by the railroad for the repair of locomotives used in interstate and intrastate transportation. At the time of the injury, he was engaged in taking down, and placing in a new location, an overhead shaft—a heavy shop fixture, through which power was communicated to machinery used in the repair work. It was held that, in such circumstances, the employe "was not employed in interstate transportation, or in repairing or keeping in usable condition a roadbed, bridge, engine, car, or other instrument then in use in such transportation." The work of changing the location of the shop fixture was "too remote from interstate transportation to be practically a part of it," and he was not therefore employed in interstate commerce within the meaning of the federal act. In *Delaware, Lackawanna and Western Railroad Co.* v. *Yurkonis,* 238 *U. S.* 439; 35 *S. Ct.* 902; 59 *L. Ed.* 1397, it was held that one employed in a colliery operated by a railroad company to mine coal intended to be used in its locomotives employed in interstate commerce is not within

the federal statute. In *Chicago B. and Q. Railroad Co.* v. *Harrington, supra,* the deceased employe was a member of a switching crew, "engaged, at the time of his death, in switching coal belonging to defendant, and which had been standing on a storage track for some time, to the coal shed, where it was to be placed in bins or chutes, and supplied, as needed, to locomotives of all classes, some of which were engaged or about to be engaged in interstate and others in intrastate traffic." Mr. Justice Hughes held that the employe's "duty was solely in connection with the removal of the coal from the storage tracks to the coal shed, or chutes," and that "this was nothing more than the putting of the coal supply in a convenient place from which it could be taken as required for use," and there was therefore "no such close or direct relation to interstate transportation" as is contemplated by the federal statute. And in *Chicago & E. I. Railroad Co.* v. *Industrial Commission, supra,* the employe was injured while engaged in oiling an electric motor which furnished power for hoisting coal into a chute, "to be taken therefrom by, and for the use of, locomotive engines principally employed in the movement of interstate freight." The railroad was engaged in both interstate and intrastate commerce. It was held that the case was within the rationale of the *Harrington case, supra,* and that the "close or direct relation to interstate transportation," requisite under the federal act, was lacking. The following cases were expressly overruled. *Erie Railroad Co.* v. *Collins,* 253 *U. S.* 77; 40 *S. Ct.* 450; 64 *L. Ed.* 790; and *Erie Railroad Co.* v. *Szary,* 253 *U. S.* 86; 40 *S. Ct.* 454; 64 *L. Ed.* 794.

In *Chicago and Northwestern Railroad Co.* v. *Bolle, supra,* the employe's duty ordinarily was to fire a stationary engine utilized to generate steam for the purpose of heating the passenger depot, baggage room and other structures used for general railroad purposes. At the time he sustained his injuries, he was using a locomotive engine substituted for the disabled stationary engine. Mr. Justice Sutherland held: "At the time of receiving his injury, he [the employe] was engaged in work not incidental to transportation in interstate com-

merce, but purely incidental to the furnishing of means for heating the station and other structures of the company. His duty ended when he had produced a supply of steam for that purpose. He had nothing to do with its distribution or specific use. Indeed, what he produced was not used or intended to be used, directly or indirectly, in the transportation of anything. It is plain that his work was not in interstate transportation, and was not so closely related to such transportation as to cause it to be practically a part of it." In *New York, New Haven and Hartford Railroad Co.* v. *Bezue, supra,* the workman, a member of an unskilled labor gang, employed in a roundhouse and machine shop equipped for the repair of locomotives used in interstate transportation, was engaged with other workmen at the time he sustained his injury in moving a pair of main driving wheels along the yard tracks to an engine pit where they were to be installed in a locomotive placed there for repairs some ten days before. Mr. Justice Roberts, speaking for the federal Supreme Court, held that "the length of the period during which the locomotive was withdrawn from service and the extent of the repairs * * * stamp the engine as no longer an instrumentality of or intimately connected with interstate activity," and distinguished such cases as *New York Central Railroad Co.* v. *Marcone, supra,* "where the injured employe was oiling a locomotive which had shortly before entered the roundhouse after completing an interstate run." And in *Shanks* v. *Delaware, Lackawanna and Western Railroad Co., supra,* which modified the earlier rule, the Supreme Court cited with approval a case in which it was held that the requisite employment in interstate commerce existed where a car repairer was replacing a draw bar in a car then in use in such commerce. Another analogous case is *Southern Pacific Co.* v. *Industrial Accident Commission, supra.* There the deceased was employed as an electric lineman. He received a fatal electric shock while wiping insulators actually supporting a wire which carried electric power manufactured at the railroad's power house and used for the movement of cars in both interstate and intrastate commerce.

Mr. Justice McReynolds held that "power is no less essential than tracks or bridges to the movement of cars," and that the work at which deceased was engaged was therefore "directly and immediately connected with interstate transportation and an essential part of it." The inquiry is "the relation of the employment to the actual operation of the instrumentalities for a distinction between commerce and no commerce." A distinction is made between instrumentalities in *actual use* and equipment out of use. The former are said "to have definite character, and give it to those employed upon them. * * * There may be a removal to the repair and construction shops, a definite withdrawal from service and placement in new relations—the relations of a workshop—its employments and employes having cause in the movements that constitute commerce, but not being immediate to it. And it is this separation that gives character to the employment, as we have said, as being in or not in commerce. Such, we think, was the situation of the engine in the present case." *Industrial Accident Commission* v. *Davis, supra.*

Such of our decisions as expressly or impliedly laid down the broader criterion of interstate commerce of necessity fell with the overruling of those of the federal Supreme Court upon which they rested. The construction placed upon federal statutes by courts of that jurisdiction is controlling here. *Herzog* v. *Hines*, 95 *N. J. L.* 98; *McGarry* v. *Central Railroad Company of New Jersey*, 105 *Id.* 590; *Cassatt* v. *First National Bank of West New York*, 111 *Id.* 536.

It is the insistence of prosecutor that "decedent in no way controlled the releasing of the coal from the chute into the tender of the locomotive; that, so far as decedent's work was concerned, he could only fill the chute with coal, it being left to another employe to release that coal from the filled chute as the occasion warranted," and that decedent's work "was limited to the unloading of coal cars." But this argument is entirely unavailing. It was decedent's duty to furnish locomotives moving exclusively in interstate commerce with the fuel necessary for the generation of motive power,

at yards maintained for the servicing of locomotives so engaged only. Such had been his employment from December 3d. 1929. The functions of the deceased and his assistant, in the coaling of the locomotives, were interdependent. Their combined efforts were essential to the rendition of the service. The former loosed the coal which, by force of gravity, dropped directly into the waiting tender; the latter merely controlled the flow of coal so as to deposit the requisite quantity in the tender, and arrest the flow until another locomotive was moved into position. It was a continuous operation. If the mechanism permitted of sole operation by the deceased from his station on the platform, his relationship to the transaction would not have been essentially different. And the contention that the residue in the chute, after the stoppage of the flow by the helper, was properly classable as storage, is obviously without substance. Such was not the function of the chute in any sense of the term. It was not a repository; it was a direct means for the transfer of fuel from the car to the engine tender.

The classification of the individual case depends, of course, upon the facts, and is not always free from difficulty. There is no precise formula which will automatically resolve every case. It is impossible to "declare a standard invariable by circumstances or free from confusion by them in application." *Industrial Accident Commission* v. *Davis, supra.* But here it is evident that the deceased, in the rendition of the service in question, was engaged in work so closely and directly related to interstate transportation as to be, for all practical purposes, a part of it. The circumstances readily admit of that classification.

This case is, therefore, distinguishable from those in which the injury was sustained while the employe was engaged in conveying to, or placing in storage bins, fuel to be employed in generating motive power for locomotives engaged in interstate commerce. Such is an indirect service not so closely or intimately related to interstate transportation as to be practically a part of it. It results that the apposite rule was correctly applied in the tribunals below.

Judgment affirmed, with costs.